UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DMG STUDIO HOLDINGS, INC.,<br>*Plaintiff*,<br><br>v.<br><br>NORTH BAY SOUTH CORPORATION, MICHYO<br>ADVISORS, INC., TRICON DEV., INC. and<br>RAPHAEL WEISS,<br>*Defendants*. | Civil No. 3:12cv890 (JBA)<br><br><br><br>August 2, 2013 |

**RULING ON DEFENDANTS' MOTION TO DISMISS**

Plaintiff DMG Studio Holdings LLC ("DMG") filed this diversity action against North Bay South Corporation ("North Bay"), Raphael Weiss, Tricon Dev., Inc. ("Tricon"), and Michyo Advisors, Inc. ("Michyo") alleging the following:

- Breach of Contract against North Bay (Count One), and against Michyo (Count Two);
- Promissory Estoppel against Tricon (Count Three), Weiss (Count Four), North Bay (Count Five), and Michyo (Count Six);
- Misrepresentation against Tricon (Count Seven), Weiss (Count Eight), North Bay (Count Nine), and Michyo (Count Ten);
- Fraud against Tricon (Count Eleven), Weiss (Count Twelve), North Bay (Count Thirteen), and Michyo (Count Fourteen);
- Connecticut Unfair Trade Practices Act ("CUTPA") against Weiss (Count Fifteen), Tricon (Count Sixteen), North Bay (Count Seventeen), and Michyo (Count Eighteen).

Defendants jointly move [Doc. # 28] to dismiss Plaintiff's Eighteen-count Complaint in its entirety, asserting that Plaintiff fails to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons that follow, the pending motion to dismiss is GRANTED in part and DENIED in part.

## I.    Factual Allegations

Plaintiff alleges the following in its Complaint [Doc. # 1]. DMG is an LLC organized under the laws of the State of Connecticut and is in the business of developing and managing a digital media and production facility in Stratford, CT. (Compl. ¶ 1.) Defendant North Bay was a corporation organized under the laws of the State of Texas that validly existed until January 28, 2011, and was in the business of providing investment financing. (*Id.* ¶¶ 2–3.) Raphael Weiss is the President of Defendants Michyo (a New York Corporation) and Tricon (a Delaware corporation registered to do business in New York), and is also in the business of providing investment financing. (*Id.* ¶¶ 4–6.)

In November 2009, Plaintiff and ExxonMobil Oil Corporation ("Exxon") entered into a purchase and sale agreement, with Plaintiff agreeing to purchase real property in Stratford, CT, which Plaintiff planned to use as a rental property "for companies engaged in the digital media, movie and entertainment industry." (*Id.* ¶¶ 7–8.) Plaintiff amended the purchase and sale agreement three times in order to extend the closing date, and eventually the purchase and sale agreement expired due to Plaintiff's inability to obtain financing in time for a January 6, 2011 closing date. (*Id.* ¶¶ 10–11.)

Plaintiff's managing member, Allen Christopher met Defendant Weiss and began discussions in April 2011 concerning Weiss potentially providing financing to Plaintiff. (*Id.* ¶ 13.) On August 22, 2011, Plaintiff and North Bay executed a Lease Agreement, Preamble, Put and Call Option, and Collateral Assignment of leases rents and profits. (*Id.* ¶ 17; *see also* Ex. A to Compl.) In this Agreement, among other provisions, North Bay agreed to advance four million dollars to Plaintiff so that Plaintiff could acquire the premises from Exxon, and Plaintiff would pay rent to North Bay. (*Id.*) The Agreement

was executed by Wayne Burmaster on behalf of North Bay and Allen Christopher on behalf of Plaintiff. (*Id.* ¶ 18.)

In reliance on this Agreement with North Bay, Plaintiff's counsel contacted Exxon to attempt to renegotiate the purchase and sale agreement, and Exxon forwarded a proposed new purchase and sales agreement to Plaintiff on October 28, 2011. (*Id.* ¶ 23.) The proposed agreement with Exxon required that Plaintiff deposit most of the purchase price into an escrow account, tendering "an additional deposit" and closing on or before December 20, 2011 (*id.* ¶ 24), and would expire on November 15, 2011 unless accepted and executed by that date (*id.* ¶ 25). Plaintiff shared the details of Exxon's proposed agreement with Defendant Weiss, who "never gave a definite answer as to whether he would deposit monies in escrow . . . despite the earlier commitment to provide financing to purchase the Premises by North Bay," and the time period within which Plaintiff had to respond to Exxon expired. (*Id.* ¶ 27.) However, Weiss provided Plaintiff with a new commitment letter dated December 7, 2011, which Plaintiff alleges was "an effort to induce Exxon to continue negotiations and give the parties additional time to close the transaction." (*Id.* ¶ 28.) This commitment letter was executed by Nadia Serrano as Vice President of North Bay, Rafi Weiss as President of Michyo Advisors and Allen Christopher. (*See* Ex. B to Compl.)[1] The December Commitment letter "reaffirmed that North Bay and . . . Michyo Advisors 1, Inc. agreed to advance the sum of Four Million

---

[1] Plaintiff alleges that Nadia Serrano is in fact Defendant Weiss's assistant and employed by Tricon, and is *not* the Vice President of North Bay. (Compl. ¶ 30.)

Dollars . . . to Plaintiff with which to purchase the Premises . . . in accordance with the terms of the original agreement dated August 22, 2011." (Compl. ¶ 31.)[2]

In connection with the Commitment letter, and "in order to induce Exxon to continue negotiations and grant additional time to close the transaction," Defendant Weiss provided a bank statement from Michyo which he authorized Plaintiff to forward to Exxon, which Plaintiff did, and which showed funds in the amout of over fifteen million dollars. (*Id.* ¶ 34.) Exxon would not agree to extend a closing date beyond December 20, 2011 unless the purchase price was placed in escrow, which Weiss refused to do. (*Id.* ¶ 35.)

Notwithstanding Weiss's refusal to place funds in escrow for Plaintiff, on December 29, 2011, Weiss emailed Plaintiff's counsel and represented that "we are prepared to proceed forward" and to close the transaction. (*Id.* ¶ 37.) On January 14, 2012, Weiss offered to contribute his own funds to the project, and on January 26, 2012 provided Plaintiff with a new Commitment letter for financing. (*Id.* ¶¶ 39–40; Ex. C to Compl.) This January 2012 Commitment letter "reaffirmed the existing agreement . . . subject only to receipt of an executed purchase and sale agreement with Exxon on or before February 3, 2012." (Compl. ¶ 41.)[3]

---

[2] Plaintiff also alleges that at the time of the Commitment letter, "there was no such entity as Michyo Advisors 1, Inc. in existence" (*id.* ¶ 32), but that it was "intended by Weiss to be a subsidiary, related party to or wholly a part of defendant Michyo Advisors, Inc." (*Id.* ¶ 33.)

[3] Plaintiff alleges that in this commitment letter, "Plaintiff was granted an option to extend the closing date with North Bay in the commitment and reaffirmation agreement . . . by thirty business days for the purpose of accommodating any delays occasioned by dealings with Exxon." (*Id.* ¶ 42.) Defendants dispute this interpretation of the Commitment letter, and point to the plain language of the letter in Exhibit C, which

On February 2, 2012, Plaintiff "reached a revised agreement" with Exxon to purchase the Premises, and informed Weiss of this agreement. (*Id.* ¶ 43.) Plaintiff emailed Defendants Weiss and Tricon an unexecuted copy of the Reinstatement of Agreement and Fifth Amendment to Purchase and Sale Agreement on February 3, 2012. (*Id.* ¶ 44; Ex. D to Compl.) Plaintiff executed the Fifth Amendment on February 3, 2012, and Exxon executed the Fifth Amendment on February 7, 2012. (Compl. ¶ 47.) This Fifth Amendment specified a closing date of no later than March 15, 2012 with a specific provision that neither party was under an obligation to agree to an extension of this closing date. (*Id.* ¶ 47.) Plaintiff informed Weiss that the March 15 closing date was "an absolute, definite closing date." (*Id.* ¶ 48.)[4] Weiss provided Plaintiff with a letter on February 17, 2012 stating that Weiss intended to proceed with the transaction and close in March. (*Id.* ¶ 52.)

On February 21, 2012, Weiss informed Plaintiff that he "may" not be able to close on March 15 because he had not secured all of the funding available to close, although Weiss did not request an extension of the closing date. (*Id.* ¶ 54.) On February 28, 2012, Weiss told Plaintiff that North Bay could not close on March 15, 2012, and claimed that North Bay had "the right to an extension" pursuant to the January 2012 Commitment letter. (*Id.* ¶ 57.) Weiss contacted Plaintiff by email on March 4, 2012 and represented that he "must have an extension to the closing date," though Plaintiff alleges that "a formal request for extension was not made by Weiss." (*Id.* ¶ 14.)

---

grants *North Bay* the ability to extend "the date by one period of thirty (30) business days." (Ex. C.)

[4] As part of the Fifth Amendment, Plaintiff agreed to relinquish any legal rights it may have had against Exxon; Plaintiff alleges that Weiss knew that Plaintiff did this "and actually suggested that Plaintiff do so in order to be able to come to a new agreement with Exxon." (*Id.* ¶¶ 50–51.)

However, Weiss then met with Plaintiff and Plaintiff's counsel on March 5, 2012 and agreed to the March 15 close date, but proposed that if he could not provide the full purchase price to Plaintiff, he would advance a sum of no less than one million dollars. (*Id.* ¶ 60.) The following day, Weiss forwarded Plaintiff a proposed agreement with different terms: namely, that North Bay would extend $50,000, rather than $1,000,000, if it could not deliver the entire purchase price. (*Id.* ¶ 61.) Plaintiff rejected these proposed terms on March 6, 2012. (*Id.* ¶ 62.)

On March 7, 2012, at the "insistence of Weiss," Plaintiff requested an extension of the closing date from Exxon for an additional thirty days,[5] though Plaintiff alleges that Weiss and Tricon informed Plaintiff via email that "they would have a list of items needed to proceed to a timely closing the following day." (*Id.* ¶¶ 66–67.) On March 8, Weiss stated in an email to Plaintiff, "Things looking good. Get me the items and let's move." (*Id.* ¶ 69.) Also on March 8, Weiss forwarded an email with a "proposed unsigned term sheet from Silver Arch Capital Partners . . . regarding a proposed loan to North Bay," which named Rafi Weiss as the President of North Bay, though Plaintiff claims that Wayne Burmaster is the President of North Bay. (*Id.* ¶¶ 72–73.) In the same email, Weiss informed Plaintiff that Defendant Michyo had "withdrawn its commitment to the Plaintiff and that funding through North Bay would take place through Silver Arch in accordance with the . . . term sheet." (*Id.* ¶ 74.)

Plaintiff provided all of the required items to Weiss that were on "the closing checklist" by March 10, 2012 (*id.* ¶ 71), however, based on the terms of the Silver Arch term sheet, "North Bay could not have possibly advanced the sum of money to Plaintiff to

---

[5] Plaintiff alleges that "as of said date no formal request of Plaintiff for extension was made by Weiss" (Compl. ¶ 66), however, by the terms of the Commitment letter, it is not clear that any "formal" request was required.

purchase the premises on March 15, 2012" (*id.* ¶ 75). On March 9, 2012, Weiss requested a thirty-day extension of the closing date, and Exxon refused to grant Plaintiff an extension of the closing date past March 15, 2012. (*Id.* ¶¶ 76–77.)

In spite of Plaintiff's requests to Weiss, Tricon, Michyo, and North Bay, none of the Defendants provided the funding Plaintiff relied on to purchase the Premises on March 15, 2012. (*Id.* ¶ 79.) On March 22, 2012, Plaintiff was formally notified by Exxon that the Fifth Amendment to their purchase and sale agreement had expired, and that Exxon would not enter into another agreement with Plaintiff. (*Id.* ¶ 80.)

As a result of Defendants' conduct, Plaintiff claims damages from breach of contract, promissory estoppel, misrepresentation, fraud, and violations of CUTPA.

## II.   Discussion[6]

### A.   Breach of Contract Claims (Counts One and Two)

Under Connecticut law, the elements of a breach of contract cause of action are: (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. *American Express Centurion Bank v. Head*, 115 Conn.App. 10, 15–16 (2009).

Defendant North Bay contends that Plaintiff has failed to allege a breach of contract claim against it because the plain, unambiguous terms of the contract permitted it to request a 30-day extension in order to provide Plaintiff with funding. Defendant

---

[6] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

Michyo asserts that Plaintiff's breach of contract claim against it fails to state a claim because Michyo and DMG were never parties to any agreement.

### 1.   North Bay

Plaintiff alleges that the January 26, 2012 Agreement "reaffirmed an agreement between Michyo Advisors 1, Inc. and North Bay to advance the sum of $4,000,000 to North Bay no later than March 10, 2012." The January Agreement provides, in pertinent part:

> It is understood that Michyo will advance the sum of $4,000,000.00 no later than March 10, 2012 to complete said transaction in accordance with the terms of the Agreement between North Bay and DMG Studio Holdings LLC which Agreement is dated August 22, 2011. It is understood that North Bay and Michyo have agreed without any reservations to close the transaction on or before March 10, 2012, provided, of course, that Exxon Mobil or one of its subsidiaries conveys title to the property . . . in accordance with the agreement that was entered into as of the above date. It is understood that much time has passed since the original agreement between North Bay and Dogstar [DMG]. There are a number of matters currently underway. Consequently, notwithstanding the foregoing, North Bay may extend the date by one period of thirty (30) business days.

(Ex. C.) Defendant North Bay asserts that there is no express requirement in the language of the Lease Agreement between North Bay and DMG that North Bay provide DMG with funding by a specific date, given the sentence permitting North Bay to extend the date by one thirty-day period.

Plaintiff argues that the language contained in Exhibit C is ambiguous. (Pl.'s Opp'n [Doc. # 33] at 9.) The Agreement provides both that "North Bay and Michyo have agreed without any reservations to close this transaction on or before March 10, 2012," and "notwithstanding the foregoing, *North Bay may extend* the date by one period of thirty (30) business days." (Ex. C (emphasis added).) "[I]n construing contracts, we give

effect to all the language included therein, as the law of contract interpretation . . .
militates against interpreting a contract in a way that renders a provision superfluous."
*Isham v. Isham*, 292 Conn. 170, 182 (2009). Plaintiff maintains that in order to read the
Agreement consistent "with everyone's understanding," it must be interpreted to mean
"that Plaintiff had a unilateral right to have North Bay extend" (Pl.'s Opp'n at 10; Compl.
¶ 42), notwithstanding the absence of any such language in the Agreement. Plaintiff
further relies on the portion of the Agreement that provides that the commitment to close
the transaction was agreed to "without any reservations" (Ex. C), arguing that taking
North Bay's interpretation of the contract would render the "without any reservations"
language superfluous. (Pl.'s Opp'n at 11.)

     While it is true that "[w]here there is definitive contract language, the
determination of what the parties intended by their contractual commitments is a
question of law," *Retrofit Partners I. L.P. v. Lucas Industries, Inc.*, 201 F.3d 155, 160 (2d
Cir. 2000) (citing *Thomson & Peck, Inc. v. Harbor Marine Contracting Corp.*, 203 Conn.
123, 130–31 (1987)), where a contract is ambiguous, the parol evidence rule does not bar
the use of extrinsic language to aid in contract interpretation, *see Hare v. McClellan*, 234
Conn. 581, 597 (1995). Accepting all factual allegations as true, Plaintiff has alleged facts
plausibly showing that, under its interpretation of the Agreement, North Bay and Michyo
had agreed "without any reservations" to provide funding in time for the March 10, 2012
deadline, and failed to deliver on this promise, thereby breaching the terms of the
Agreement.

     Plaintiff also alleges that North Bay was not a validly existing legal entity with the
capacity to contract at the time the parties entered into the January 26 Agreement, which
renders North Bay's conduct a breach of the implied covenant of good faith and fair

dealing. (Pl.'s Opp'n at 12; Compl. ¶¶ 2, 85.) Though Defendant proffers web pages from Texas's Department of State which purport to show that North Bay and Michyo are both active corporations currently in good standing (*see* Reply [Doc. # 34-2] at 3), this does not address Plaintiff's allegation that at the time of the Agreement, the corporations were nonexistent.

At oral argument, Plaintiff raised an additional ground for opposing Defendant's motion to dismiss the contract claim against North Bay, contending that North Bay's alleged conduct leading up to the March 10 date impliedly waived its right to extend by 30 days. "Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so." *Banks Bldg. Co. v. Malanga Family Real Estate*, 102 Conn. App. 231, 239 (Conn. App. 2007) ("Here, the failure of the defendant to enforce the September 13, 2002 deadline, its conduct in allowing the plaintiff to continue to work toward finalizing construction, and working collectively with the plaintiff to finish the project constitute more than mere acquiescence and support the court's finding that the time is of the essence provision was waived."). Accepting Plaintiff's allegations as true, it is plausible that North Bay's conduct in allowing DMG to continue working toward and anticipating the March 10 closing date and only requesting a thirty-day extension on March 9, constituted an implied waiver of its right to extend.

For all the reasons discussed above, because Plaintiff has set forth sufficient factual allegations to plausibly suggest that North Bay breached its Agreement with DMG, Defendants' motion to dismiss Count One must be denied.

2.  Michyo

Defendant Michyo argues that the plain language of the January 26 Agreement states that "there is no privity between Michyo and Plaintiff," and that accordingly, Plaintiff's breach of contract claim against Michyo must be dismissed. In opposition, Plaintiff argues that read within the entirety of the Agreement, the sentence disclaiming privity should be construed as ambiguous, and further, that even if the Court were to find absence of privity between Michyo and DMG, DMG should be considered a third party beneficiary to the contractual agreement between Michyo and North Bay and entitled to enforce contractual obligations under the Agreement. *See Gateway v. DiNoia*, 232 Conn. 223, 231 (1995) ("A third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract.").

The plain language of the Agreement contemplates an agreement with DMG in addition to the Michyo/North Bay Agreement: "This will reaffirm that there is an existing agreement between North Bay . . . and Michyo . . . to advance the sun of $4,000,000.00 . . . under *said Agreement with DMG Studio Holdings LLC* ('Dogstar') covering the property located [in] . . . Stratford." (Ex. C (emphasis added)). "The proper test to determine whether a lease creates a third party beneficiary relationship is whether the parties to the lease intended to create a direct obligation from one party to the lease to the third party." *Gateway*, 232 Conn. at 231 (citing *Knapp v. New Haven Road Construction Co.*, 150 Conn. 321, 325 (1963) ("'the ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary].'")).

Under Plaintiff's theory that DMG is a third party beneficiary to the Michyo/North Bay Agreement, it is at least minimally plausible that the language of the January 26 Agreement shows that Michyo/North Bay intended to assume a funding obligation to DMG. *Gateway*, 232 Conn. at 231.

However, Defendants' second argument in support of dismissal of Count Two—that even if there were a contract between Michyo and DMG, that contract expired on February 3, 2012—is fatal to Plaintiff's breach of contract claim against Michyo. The Agreement provides: "[i]t is understood that this commitment is subject only to receipt of an executed agreement with Exxon Mobil or one of its subsidiaries on or before February 3, 2012." (Ex. C.) Defendants maintain that because the agreement was only executed by *Plaintiff* within that timeframe (*see* Compl. ¶ 45) but not by Exxon, any obligation Michyo had to DMG expired on February 3, 2012. This is consistent with how the term "executed" is used in the Agreement, as it contemplated an "executed agreement with Exxon Mobile or one of its subsidiaries." (Ex. C.) Thus, by the plain terms of the Agreement, Plaintiff's breach of contract claim against Michyo must fail, and Defendants' motion to dismiss Count Two is therefore granted.

### B.  Promissory Estoppel  Claims (Counts Three–Six)

To allege a claim of promissory estoppel, a Plaintiff must plead a "clear and definite promise," "reasonably expect[ed] to induce action or forebearance on the part of the promisee or a third person," where enforcement of that promise is "binding if injustice can be avoided only by enforcement of that promise." *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 104 (2003).

Plaintiff has alleged that the Defendants made the following "clear and unambiguous promises" to Plaintiff:

- that Weiss and Tricon (through Weiss) were "committed to the project and [would provide] the funding source" (Compl. ¶ 36; Counts Three & Four ¶¶ 82),
- that North Bay through its officers and agents promised that it was "willing to lend money and had the financial wherewithal to finance the transaction with Exxon" (Count Five ¶ 82), and
- that Michyo would "finance the transaction with Exxon by providing funding to North Bay," and was "able to lend money" (*id.* Count Six ¶¶ 81–82).

Plaintiff alleges that as a result of each of these "clear and unambiguous" promises, it reasonably relied on Defendants' representations that they would provide funding, and as a result failed to attempt to secure alternate financing for its property purchase from Exxon. (*See, e.g.*, *id.* Count Six ¶ 85.)

Defendants argue that Plaintiff is foreclosed from asserting a promissory estoppel claim where there is a valid contract, *see Scapa Tapes N. Am., Inc. v. Avery Dennison Corp.*, 384 F. Supp. 2d 544, 562 (D. Conn. 2005) ("[P]laintiff's claim for promissory estoppel cannot be maintained where a valid contract supported by consideration is shown to exist."). Plaintiff acknowledges that this rule would apply to Defendant North Bay, but there is no contract claim remaining as to Michyo, and Defendants Weiss and Tricon were never parties to any of the written contracts with DMG.

1. Promissory Estoppel as to North Bay and Michyo

Plaintiff contends that it should be able to plead its promissory estoppel claims in the alternative as to North Bay and Michyo, because it has alleged that at the time the parties entered into their January Agreement, North Bay and Michyo were not valid legal entities. At oral argument, Plaintiff represented that if its breach of contract claims against North Bay and Michyo withstood summary judgment, then it would withdraw its promissory estoppel claims, but maintained that it was too early in the proceedings to make such a determination.

13

In *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 88 (2005), the Connecticut Supreme Court noted that "we have permitted a jury to consider in the alternative claims for breach of contract and for promissory estoppel when there is an issue of whether the agreement may be too indefinite to allow for contract formation." *See also Benedetto v. Wanat*, 79 Conn. App. 139, 151–52 (Conn. App. 2003) (considering the underlying oral agreement under both theories of liability and concluding "it is clear that the oral agreement was enforceable under either the doctrine of promissory estoppel or as supported by consideration").

Even if Defendants entered into the Agreement before they became valid legal entities, the Appellate Court of Connecticut has stated:

> a contract entered into prior to an entity's formation is not void ab initio due to lack of capacity because the individual entering into the contract on behalf of the unformed entity has the requisite capacity. It follows that, in the situation of an unformed entity, the individual serves as the party to the contract although the contract is entered into in the entity's name.

*BRJM, LLC v. Output Sys., Inc.*, 102 Conn. App. 143, 152 (2007).  Thus if North Bay was not capable of entering into a contract with Plaintiff, the breach of contract claim could still be asserted against the individual who had entered into the Agreement with Plaintiff on behalf of North Bay—i.e., Defendant Weiss.

Because determinations about North Bay's capacity to enter into a contract require further factual development, the Court will not dismiss the promissory estoppel claim against North Bay at this stage. As to Michyo, the allegations suggest that Michyo accepted the fully executed agreement from DMG on February 7, 2012, and continued to allow Plaintiff to believe that Michyo would provide funding in accordance with the parties' Agreement, and that Plaintiff acted in reliance on Michyo's conduct, thus

14

plausibly stating a claim for promissory estoppel. Defendants' motion to dismiss Counts Five and Six is denied.

### 2. Promissory Estoppel as to Weiss and Tricon

Plaintiff has alleged that clear promises were made by Weiss and Tricon providing funding to Plaintiff, and that Plaintiff relied on these promises to its detriment by not timely seeking alternate sources of funding to make its purchase from Exxon. (Counts Three & Four ¶¶ 82–85.) These allegations are sufficient to state a claim for promissory estoppel, and Defendants' motion to dismiss Counts Three and Four against Weiss and Tricon is denied.

### C. Negligent Misrepresentation Claims (Counts Seven–Ten)

An action for negligent misrepresentation requires a plaintiff to plead facts demonstrating that a defendant made a misrepresentation of fact that it knew or should have known was false, on which the plaintiff reasonably relied to its pecuniary detriment. *Glazer*, 274 Conn. at 73.

Plaintiff alleges that Defendants knew or should have known that their representations that they were able and willing to provide funding to Plaintiff were false, and that DMG was harmed when it acted in reliance on Defendants' misrepresentations. (*See* Counts Seven & Eight ¶¶ 82; Counts Nine & Ten ¶¶ 82, 83–84.)

Defendants assert that Plaintiff's misrepresentation claims must be dismissed because the August 2011 Agreement with North Bay bars DMG from claiming reliance on representations or omissions outside of the Agreement, and because Plaintiff cannot "prove" proximate cause.

However, Plaintiff emphasizes that its factual allegations of misrepresentation and fraud "have nothing to do with the terms of the written contract," but instead concern the

later representations made to Plaintiff in the days and months leading up the March 10, 2012 deadline. (Pl.'s Opp'n at 23.) These allegations against Defendants Michyo and North Bay are their misrepresentations about the companies' ability and commitments to lend money in February and March 2012, and their failure to disclose negative information about their financial condition *at that time*. Thus, Defendants' assertion that the merger clause contained in the August 2011 Agreement between North Bay and Michyo forecloses Plaintiff's misrepresentation and fraud claims is without merit.

As to the allegations against Tricon and Weiss, Plaintiff sets out facts which, if true, plausibly show the existence of representations about Defendants' ability and willingness to fund Plaintiff's purchase with Exxon, including that they wanted to "do the deal" with Plaintiff and Exxon (Compl. ¶ 63), and "[t]hings [were] looking good. Get me the items and let's move," (*id.* ¶ 69), and that Defendants knew or should have known that these representations were false. Plaintiff also alleges that it relied on Tricon's and Weiss's representations to its detriment when it failed to procure alternate funding in the months and weeks leading up to the closing date in March 2012.

Finally, Defendants' assertion that Plaintiff cannot "possibly prove proximate cause" as grounds for dismissal mistakenly assumes that Plaintiff has an obligation to "prove" anything at this stage of the proceedings. Plaintiff has properly alleged that it relied on Defendants' representations of willingness and ability to finance this purchase, and that because of a pending SEC enforcement lawsuit, Defendants knew or should have known that they would not have access to the funds they committed to Plaintiff, as well as Plaintiff's allegation that that North Bay and Michyo were not the valid corporations they represented themselves to be, capable of entering into the agreement.

While the factual allegations may ultimately be unproved or otherwise insufficient at a later stage, Plaintiff has alleged facts which, if true, state plausible misrepresentation claims against all Defendants. Thus, the Court denies Defendants' motion to dismiss Counts Seven through Ten.

### D.  Fraud Claims (Counts Eleven–Fourteen)

The essential elements of a fraud claim are: "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Miller v. Appleby*, 183 Conn. 51, 54–55 (1981). Under Fed. R. Civ. P. 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To satisfy Rule 9(b), a complaint must "specify the time, place, speaker, and content of the alleged misrepresentations," "explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (citing *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001)).

Defendants argue that Plaintiff has failed to plead its fraud claims with sufficient particularity to satisfy the requirements of Rule 9(b). Plaintiff alleges the following representations made as "statements of fact" by Defendants and known by them to be untrue:

(1) When the December 2011 and January 2012 Commitment letters were signed, Nadia Serrano was held out to be the Vice President of North Bay and Weiss was held out to be the President of Michyo Advisors 1, Inc.;

17

(2) Serrano was actually Weiss's assistant, not the Vice President of North Bay (Compl. ¶¶ 28–30);

(3) At the time of the commitment letters, Michyo Advisors 1, Inc. did not exist (*id.* ¶¶ 31–32); and

(4) Various statements that the defendants were ready and able to provide funding as the March 15, 2012 closing date approached (*id.* ¶¶ 36, 37, 39, 52, 67).

Counts Eleven, Twelve, Thirteen, and Fourteen all allege in a cursory manner that the defendant in question made such representations and that each defendant "knew, or reasonably should have known . . . were false" (Count Eleven ¶ 84; Count Twelve ¶ 84; Count Thirteen ¶ 84; Count Fourteen ¶ 84.)

At oral argument, Plaintiff's counsel conceded that Plaintiff was essentially pleading its fraud counts as an alternative to its negligent misrepresentation claims, that is, that Defendants either knew, or reasonably should have known, that the representations made to Plaintiff were false, and that further discovery would enable Plaintiff to better identify how much Defendants knew when they made such representations. Plaintiff's counsel emphasized the factual allegations concerning the misrepresentations about Ms. Serrano's position in the organization, as well as the invalidity of the Tricon, Michyo, and North Bay corporations as forming the basis of its fraud claims, because they evinced a "larger pattern" of deception, in that Plaintiff was left with no recourse "because we'd be looking to sue entities that don't exist."

However, fraud and negligent representation claims are not interchangeable or alternative variants, because fraud requires factual allegations "giving rise to a strong inference" of Defendants' intent to defraud, knowledge of the falsity, or reckless disregard for the truth. *Caputo*, 267 F.3d at 191. Plaintiff does not allege facts plausibly showing that

the Defendants had the required fraudulent state of mind at the time of their representations for the purpose of inducing detrimental action on Plaintiff's part, such as facts implying a plausible reason why Defendants fraudulently or recklessly deceived Plaintiff into moving forward with the March close date, *see Conn. Nat. Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987) ("On the facts pleaded, there is no plausible reason why Fluor would have any intention to deceive St. Joe shareholders about the proration date of its tender offer."). Further, despite Plaintiff's counsel's claim of some "larger pattern" of deception, the Complaint fails to set forth facts describing any "larger pattern" or purpose of Defendants, nor does it allege that Plaintiff went forward with the Exxon purchase *because* of the alleged false representations particular to Ms. Serrano's title, or the validity of Tricon, Michyo, and North Bay, nor that Defendants could not have provided their promised funding because of the irregularities in corporate, or corporate officer, status. In fact, the Complaint clearly alleges that Plaintiff's desire to purchase the Exxon property long predated its dealings with Defendants. (*See* Compl. ¶¶ 7–11.) Accordingly, Defendants' motion to dismiss the fraud counts is granted.

### E.   CUTPA Claims (Counts Fifteen–Eighteen)

To state a claim under CUTPA, Plaintiff must allege an unfair or deceptive practice under the "cigarette rule": "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (competitors or other businessmen)." *Cheshire Mortgage Serv., Inc. v. Montes*, 223 Conn. 80, 105–06 (1992) (internal citations omitted). "All three

criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* To prevail on a CUTPA claim, the plaintiff must establish both that the defendant engaged in a prohibited act and that the prohibited act was the proximate cause of the harm to the plaintiff. *Priority Sales Mgmt., Inc. v. Carla's Pasta*, Inc., 3:10-CV-1918(CFD), 2011 WL 3819748, at * 3 (D. Conn. Aug. 26, 2011) (citing *Abrahams v. Young & Rubicam, Inc.*, 240 Conn. 300, 307 (1997)).

In Counts Fifteen through Eighteen, Plaintiff alleges the following "unfair and deceptive acts or practices" that caused Plaintiff "irreparable harm":

- On June 4, 2012, Weiss offered to purchase the Premises directly from Exxon for $3.1 million, although he knew that Plaintiff was in negotiations with Exxon and Plaintiff was planning to offer a lower purchase price (Compl. Count 15 ¶¶ 81–82);
- Weiss misrepresented to Plaintiff that North Bay was a "validly existing corporation . . . able and willing to lend money," that "Michyo 1 Advisors, Inc. was a validly existing corporate entity . . . able to lend money," that he was the President of North Bay, that "he was committed to the project and was the funding source" (*id.* ¶¶ 85a–l).
- Tricon, acting through its President, made the same misrepresentations (*id.* Count 16 ¶¶ 84a–l);
- North Bay misrepresented that it was a "validly existing corporate entity . . . able to lend money . . . able to finance the transaction with Exxon," that it was "willing to lend money to acquire the Premises," failed to disclose that it had a civil enforcement lawsuit pending against it in Florida for a "pump and dump" scheme (*id.* Count 17 ¶¶ 82a–d);
- Michyo represented that it was a validly existing corporate entity, able to lend money to Plaintiff, and failed to disclose the same SEC enforcement lawsuit against it and its President, Wayne Burmaster (*id.* Count 18 ¶¶ 83a–d).

Defendants argue that mere breach of contract does not "offend traditional notions of fairness and does not constitute a violation of CUTPA." *Priority Sales*, 2011 WL 3819748, at * 3. However, Plaintiff's Complaint alleges more than "simple breach of

20

contract." *See id.* Further, Plaintiff's CUTPA claims are based on allegations that Defendants' deceptive misrepresentations about their corporate status and officers and commitment to finance the Exxon purchase induced Plaintiff to forgo other funding opportunities. (*See* Compl. ¶¶ 7–80.) In particular, Plaintiff sets out in Counts Fifteen & Sixteen the misrepresentations of Weiss and Tricon, and in Counts Seventeen & Eighteen, the misrepresentations of North Bay and Michyo, that allegedly led Plaintiff to lose its opportunity to purchase the property. Plaintiff also alleges that after its plan to purchase the property with Defendants' funding fell through, Defendant Weiss then attempted to outbid DMG by working directly with Exxon to purchase the same property that DMG was still trying to buy. (*Id.* Count 15 ¶¶ 81–82.)

Defendants cite to *Woodwinds, Inc. v. Dimeo*, No. 99-9473, 2000 WL 1425161, 229 F.3d 1136 (2d Cir. Sept. 27, 2000), in which allegations of failure to follow through on a promise to provide financing were found to not violate CUTPA. There, however, the district court and the Second Circuit had the benefit of analyzing the plaintiffs' CUTPA claims with an evidentiary record developed on summary judgment, and in affirming the district court's grant of summary judgment, the Second Circuit concluded, "there is no *evidence* of any representations by the defendants to the plaintiffs regarding these matters, let alone representations which would satisfy the elements of a CUTPA claim." 2000 WL 1425161, at *2 (emphasis added).

While further factual development may reveal that Defendants engaged in no unfair or deceptive practice violating CUTPA, or that Plaintiff cannot establish proximate cause between the alleged unfair conduct and its harm, Plaintiff's facts plausibly imply that Defendants' failures to fund Plaintiff's purchase of the Exxon property were to enable Defendants to later purchase the property themselves, causing Plaintiff to lose its

$600,000 deposit paid to Exxon towards the purchase of the property.  Thus, Defendant's motion to dismiss the CUTPA counts is DENIED.

**III.     Conclusion**

For the reasons discussed above, Defendants' motion [Doc. # 28] to dismiss is GRANTED in part, as to Count Two, the breach of contract claim against Michyo and as to Counts Eleven through Fourteen, the fraud counts, and DENIED as to all other counts. Accordingly, Counts One, Three–Ten, and Fifteen–Eighteen remain for further adjudication.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 2nd day of August, 2013.